United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re Last Brand, Inc. d/b/a Quince Pricing Litigation.

Case No. 25-cv-09780-EMC

**ORDER GRANTING MOTION TO DISMISS**

Docket No. 58

Plaintiffs, on behalf of a class, filed suit against Defendant Last Brand, Inc. d/b/a Quince for violations of the consumer protection laws of nine states (California, Connecticut, Florida, Illinois, Massachusetts, New Jersey, New York, Oregon, and Washington), and the District of Columbia. They pursue a nationwide class under California law or, in the alternative, statewide classes under the respective state laws. Plaintiffs allege that Quince's pricing is deceptive, either because strike-through pricing and a "You save X%" message on each product page mislead consumers into believing the product is on sale, or because information on the product page comparing the Quince product to similar products sold by other retailers misleads consumers into believing that Quince's products are comparable to or better than the products sold by those other retailers.

Quince moved to dismiss. Dkt. No. 58 ("Mot."). Having considered the parties' briefs and the oral argument of counsel, the Court **GRANTS** Quince's motion but gives Plaintiffs leave to amend. Quince's request for judicial notice (Dkt. No. 58-1) and Plaintiffs' motion to leave to file supplemental briefing regarding that request (Dkt. No. 68) are **DENIED** as moot.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Factual Background

In the Consolidated Amended Complaint, Plaintiffs allege as follows.

Quince is a San Francisco-based e-commerce brand that sells apparel, accessories, housewares, and other consumer products. Dkt. No. 50 ("CAC") ¶ 26. Quince claims to source high-quality materials directly from factories in a business model that allows it to offer "premium quality at more accessible prices." *Id.* ¶ 31. On each product page on its website, Quince uses strike-through pricing on what it calls "traditional retail" prices and claims that consumers "save X%" by purchasing the product through Quince. *Id.* ¶ 33. For example, the product page for Quince's Mongolian Cashmere Crewneck Sweater shows a price of $50 next to a crossed-out price of $148. Directly under the $50 price, the page states, "You save 66%."




*Id.* ¶ 34, fig. 1.

The "traditional retail" price is based on what different retailers charge for a similar product. *Id.* ¶ 38. For instance, the "traditional retail" price for the above Mongolian Cashmere Crewneck Sweater is based on what J.Crew charges for a cashmere sweater. *Id.* The "You save X%" statement is based on the difference between what the other retailer charged for the similar product and what Quince charges for its product. *Id.* The price Quince charges is not a "sale" price. Instead, it is the "everyday, regular Quince price." *Id.* ¶ 41.

Also on each product page is a table titled "Beyond Compare," which is located below the "Add to Cart" button and product details. *Id.* ¶¶ 42, 60. For consumers accessing the website on a mobile device, the "Beyond Compare" table appears below product reviews. *Id.* ¶ 60. The table compares the featured Quince item to a curated selection of products from high-end brands that

are being sold at higher prices than the Quince item. *Id.* ¶ 44. Plaintiffs allege that Quince only includes "higher-priced luxury brands such as J.Crew, Everlane, and Naked Cashmere" in the table and excludes products from "mid-tier or value-oriented brands." *Id.* ¶ 46. Quince does not provide links to the other retailers' products or an explanation of how it selects the products it includes in the table. *Id.* ¶¶ 47–48. Plaintiffs allege that the "Beyond Compare" table is designed to highlight attributes of a product where Quince performs well, such as "Free Shipping," while omitting characteristics where Quince may not perform as well, such as resale value. *Id.* ¶ 50.

Consumers can hover over an "i" icon to view a disclaimer about the table, which states, "Competitor information gathered in [MONTH AND YEAR]; pricing is subject to change." *Id.* ¶ 52. There is no similar disclosure next to the product's price or the struck-through reference price. *Id.* ¶¶ 57, 83.



BEYOND COMPARE ⓘ

Competitor information gathered in October 2025; pricing is subject to change.

| | QUINCE | J.CREW | EVERLANE | NAKED CASHMERE |
|---|---|---|---|---|
| PRICE | $50.00 | $148.00 | $178.00 | $295.00 |
| SAVINGS (%) | ● | 66% | 72% | 83% |
| 100% GRADE-A MONGOLIAN CASHMERE | ● | × | × | × |
| FREE SHIPPING | ● | × | ● | ● |
| FREE RETURNS | 365 days | 30 days | 30 days | 21 days |

*Id.* ¶ 43, fig. 3.

Quince uses terms such as "discounted" and "steals" to refer to its products in advertising and on its website. *Id.* ¶¶ 66–67. Quince states on its website that it "keep[s] prices low by using a factory-direct model that cuts out the supply-chain middlemen and reduces costs." *Id.* ¶ 31 n.6.

Plaintiffs are sixteen individuals who bought items from Quince between January 2022 and

September 2025. *Id.* ¶¶ 119–358. They each allege that the representations that Quince made on the listing page for the purchased products – specifically, the crossed-out "traditional retail" price and accompanying "You save X%" statement – were substantially similar to those described above. *Id.* They each allege that they reasonably understood the crossed-out price to represent a price at which Quince or other retailers had previously sold identical products. *Id.* The purchased products had never been sold, by Quince or any other retailer, at the crossed-out price. Plaintiffs allege that they relied on the struck-through "traditional retail" price and the "You save X%" statement in deciding to purchase products from Quince at the prices they paid. *Id.* ¶ 390. But for these representations, Plaintiffs "would not have purchased Quince's products at all, or, at a minimum, would not have paid the prices they did." *Id.* ¶ 391.

Based on the above allegations, Plaintiffs assert the following causes of action. The first three causes of action, violations of California consumer protection laws, are asserted on behalf of a nationwide class or, in the alternative, on behalf of a California statewide class. The remaining causes of action are asserted in the alternative on behalf of statewide classes in each respective state.

(1) Violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 et seq.)

(2) Violation of California's False Advertising Law (Cal. Bus. & Prof. Code §§ 17500 et seq.)

(3) Violation of California's Consumer Legal Remedies Act (Cal. Civ. Code §§ 1750 et seq.)

(4) Violation of the Massachusetts Consumer Protection Act (Mass. Gen. Laws Ann. Ch. 93A)

(5) Violation of New York General Business Law § 349

(6) Violation of New York General Business Law §§ 350 et seq.

(7) Violation of the New Jersey Consumer Fraud Act ("NJCFA") (N.J. Stat. Ann. §§ 56:8-1 et seq.)

(8) Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act



United States District Court
Northern District of California

("ICFA") (815 ILCS 505/1 et seq.)

(9) Violation of the Oregon Unlawful Trade Practices Act ("UTPA") (Or. Rev. Stat. § 646.605, et seq.)

(10) Violation of the Washington Consumer Protection Act ("WCPA") (RCW § 19.86, et seq.)

(11) Violation of the District of Columbia Consumer Protection Procedures Act ("CPPA") (D.C. Code § 28-3901, et seq.)

(12) Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Fla. Stat. § 501.201, et seq.)

(13) Violation of the Connecticut Unfair Trade Practices Act ("CUTPA") (Conn. Gen. Stat. § 42-110a, et seq.)

### B. Procedural History

Plaintiff Mandel initially filed her class action complaint on November 13, 2025, alleging violations of California consumer protection laws on behalf of a putative nationwide class. Dkt. No 1, ¶¶ 3, 26. After Defendant moved to dismiss on February 5, 2026, Dkt. No. 25, Plaintiff Mandell, joined by additional Plaintiffs, filed a First Amended Complaint ("FAC") on March 5, 2026. Dkt. No. 27. The FAC alleged violations of the consumer protection laws of California, Illinois, Massachusetts, New Jersey, New York, Washington, and Oregon on behalf of a nationwide class under California law or, in the alternative, state subclasses from each state. *Id.* ¶¶ 271–72. Defendant moved to dismiss the FAC on April 2, 2026. Dkt. No. 34. On April 10, the Court entered an order consolidating the original action with two materially identical actions and directed the filing of a consolidated complaint. Dkt. No. 38. On June 8, 2026, Plaintiffs filed the CAC. Dkt. No 50. On July 8, 2026, Defendant filed its motion to dismiss the CAC, which is now before the court.

## II. <u>LEGAL STANDARD</u>

To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007),

United States District Court
Northern District of California

a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

Because Plaintiffs are essentially claiming false advertising here, Rule 9(b) is also implicated. Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "To satisfy this requirement, a pleading must identify 'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" *United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018) (quoting *United States ex re. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011)).

## III. <u>DISCUSSION</u>

Plaintiffs bring claims under the consumer protection statutes of nine states (California, Connecticut, Florida, Illinois, Massachusetts, New Jersey, New York, Oregon, and Washington), and the District of Columbia. Neither party disputes that all these claims are governed by the same "reasonable consumer" test, which asks whether Defendant's conduct would likely deceive a

reasonable consumer.[1] As this test has been articulated when applying California law, courts ask whether members of the public, acting reasonably under the circumstances, are likely to be deceived by a defendant's representation. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). This "likelihood to deceive" must be "more than a mere possibility that the advertisement might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner" but rather "a probab[ility] that a significant portion of the general consuming public or of targeted consumers . . . could be misled." *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003). Other states may apply a different interpretation of the "reasonable consumer" test, but neither party advocates that another interpretation should be used here. Nor have they asserted there are material differences between the standard used in California and that employed in other states. Thus, the Court applies California's articulation of the reasonable consumer standard.

Defendants argue that Plaintiffs fail to allege that a reasonable consumer would be deceived by Quince's marketing strategy. Mot. at 18. Plaintiffs offer two ways in which a

[1] *Whiteside v. Kimberly Clark Corp*, 108 F.4th 771, 777 (9th Cir. 2024) ("Claims under [the UCL, FAL, and CLRA] are governed by the 'reasonable consumer' standard."); *Caldor, Inc. v. Heslin*, 215 Conn. 590, 597 (1990) (For a practice to be deceptive under CUTPA, there must be a "representation, omission, or other practice likely to mislead consumers . . . [who] interpret the message reasonably under the circumstances."); *Galvin v. Ruppert Nurseries, Inc.*, 341 A.3d 1165, 1174 (D.C. 2025) ("A claim of an unfair trade practice [under the D.C. CPPA] is properly considered in terms of how the practice would be viewed and understood by a reasonable consumer.") (internal quotations omitted); *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) (deception under the FDUTPA occurs "if there is a 'representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances.") (quoting *Millennium Comms. & Fulfillment, Inc. v. Off. of the Att'y Gen.*, 761 So.2d 1256, 1263 (Fla. 3d DCA 2000)); *Craw v. Clorox Co.*, 692 F. Supp. 3d 854, 859 (C.D. Ill. 2023) (for a misleading claim under the ICFA the plaintiff must plead that the representation is "likely to deceive reasonable consumers"); *Dorris v. Danone Waters of Am.*, 711 F. Supp. 3d 179, 188 (S.D.N.Y. 2024) (applying a reasonable consumer standard to [Massachusetts's] Chapter 93A); *In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Pracs. & Prods. Liab. Litig.,* 288 F. Supp. 3d 1087, 1184 (D.N.M. 2017) ("Under the NJCFA, the test for deception turns on the perception of a reasonable consumer."); *Gold v. Lumber Liquidators, Inc.*, 2015 WL 7888906 at *11 (N.D. Cal. Nov. 30, 2025) ("[A] representation is deceptive under [New York's] GBL where it is likely to mislead a reasonable consumer acting reasonably.") (internal quotations omitted); *Pearson v. Philip Morris, Inc.*, 358 Or. 88, 135 n.26 (2015) (whether a product's label was a misrepresentation under the UTPA "is determined based on an objective standard of what a reasonable consumer would understand the representation to be"); *Panag v. Farmers Ins. Co. of Wash.*, 166 Wash. 2d 27, 50 (2009) ("Deception exists [under the WCPA] 'if there is a representation, omission, or practice that is likely to mislead' a reasonably consumer.") (quoting *Sw. Sunsites, Inc. v. Fed. Trade Comm'n*, 785 F.2d 1431, 1435 (9th Cir. 1986)).

United States District Court
Northern District of California

United States District Court
Northern District of California

reasonable consumer could be misled. First, a consumer would interpret Quince's slash-through prices and "You save X%" message to mean that the same identical item was previously sold at the higher price by Quince or another retailer. And second, a consumer would believe that the Quince product, if not identical, is of the same or better quality than the higher priced product sold by others, such as those listed in the "Beyond Compare" table. For the reasons below, Plaintiffs have not adequately plead either theory.

**A. The "Sale Price" Theory**

Plaintiffs' first theory of deception is that the strike-through pricing and "You save X%" statement on each product page would lead a reasonable consumer to believe that the price being offered is a sale price and that the same, identical product was previously sold at the higher, struck-through price by either Quince or another retailer. CAC ¶ 37; Dkt. No. 63 (Opp'n) at 6. This theory fails because the phrase "traditional retail" would not lead a reasonable consumer to believe that either Quince or another retailer sold an identical product for the higher price, and that the Quince price was a "sale" price.

Where a selling price of merchandise is juxtaposed against a reference price, courts have found the reference price was plausibly deceptive where the product was sold exclusively by the retailer and had never been sold at the higher reference price. For instance, in *Evans v. DSW, Inc*, 2017 WL 7058233, at *7–8 (C.D. Cal. Feb. 2, 2017), DSW displayed the reference price next to the words "Compare At" and included the phrase "YOU SAVED X" on each receipt, showing the difference between the "Compare At" price and the price the customer paid. This wording deceptively suggested that the same item was being offered at a sales price below the previously offered higher price. Other courts have reached similar conclusions. *See Poulopoulos v. OpticsPlanet, Inc.*, 2024 WL 3822774, at *5–6 (C.D. Cal. Aug. 8, 2024) (strike-through price accompanied by "Save X%"); *Vizcarra v. Michaels Stores, Inc.*, 710 F. Supp. 3d 718, 729 (N.D. Cal. 2024) (reference price accompanied by phrase, "20% off regular price purchases"); *Orona v. Patagonia, Inc.*, 832 F. Supp. 3d 1126, 1138–39 (S.D. Cal. Mar. 31, 2026) (reference price accompanied by an advertised "sale" price).

In contrast, the term "traditional retail" used by Quince does not suggest that the item is being offered at a "sale" price discounted from a higher regular price for the same item. No reasonable consumer could think that "traditional retail" refers to the regular non-sale price of the same product. The term "traditional retail" simply does not so suggest.

Even if the term "traditional retail" were deemed ambiguous so as to allow an inference that the Quince price might represent a sales price discounted from its normal full retail price, any such inference would be foreclosed by the "Beyond Compare" table which appears on the same webpage. That table makes clear that the "traditional retail" price is based on *other* retailers' prices for other products similar to but not identical to Quince's. The table highlights differences between the Quince product and the comparable products sold by other retailers. For instance, the "Beyond Compare" table for Quince's Mongolian Cashmere Crewneck Sweater shows that Quince's product is made of "100% Grade-A Mongolian Cashmere," while the comparable products sold by J. Crew, Everlane, and Naked Cashmere are not.

BEYOND COMPARE

Competitor information gathered in October 2025; pricing is subject to change.

| | QUINCE | J.CREW | EVERLANE | NAKED CASHMERE |
|---|---|---|---|---|
| PRICE | $50.00 | $148.00 | $178.00 | $295.00 |
| SAVINGS (%) | ● | 66% | 72% | 83% |
| 100% GRADE-A MONGOLIAN CASHMERE | ● | × | × | × |
| FREE SHIPPING | ● | × | ● | ● |
| FREE RETURNS | 365 days | 30 days | 30 days | 21 days |

CAC ¶ 43, fig. 3. Thus, a reasonable consumer seeing the "Beyond Compare" table would be disabused of any impression that the Quince price was a sale price of the same identical item sold by Quince or another retailer. "Traditional retail" clearly refers to prices charged by other retailers for a comparable product.

To be sure, the parties disagree about whether the "Beyond Compare" table on each product page should be considered when evaluating whether the reasonable consumer would believe that Quince's products are on sale. *See* Mot. at 21–24; Opp'n at 16. It appears to be a question of first impression whether information partway down a webpage should be considered part of the "front label" or "back label." While "clicking on [a] question mark icon . . . , clicking [a] toggle . . . , or [navigating to the] Terms of Use or Frequently Asked Questions " on a website constitutes "more extensive investigation than simply flipping a product over to read the back label," *Ramos v. EyeBuyDirect, Inc.*, 2025 WL 2633103, at *10 n.7 (C.D. Cal. Aug. 27, 2025), there is no such barrier here. A Quince consumer would not need to scroll far on the product page to see the "Beyond Compare" table. While the table appears below the "Add to Cart" button, it is on the same webpage as the product and does not require navigating to another page or clicking on any buttons or toggles. CAC ¶¶ 59–60; figs. 5–6. And it is fairly proximate to the "Add to Cart" button. Certainly, scrolling partway down the webpage to view the table in this instance is less onerous than flipping over a physical product to read its back label. Thus, the "Beyond Compare" table should be considered as something a reasonable consumer would see.

But even assuming for the sake of analysis that the "Beyond Compare" table is akin to the back label of a product and not deemed presumably visible to the reasonable Quince consumer, the webpage still is not misleading under the analogous legal framework for determining when a reasonable consumer is charge with knowledge on a product's back label. Under the Ninth Circuit's framework, the presumption that a consumer is charged with information stated on the back label turns on whether the front label is sufficiently ambiguous so as to warrant the presumption. The Ninth Circuit's test for whether the front label is sufficiently ambiguous has evolved in recent years. In *McGinity v. Proctor & Gamble Co.*, 69 F.4th 1093, 1098 (9th Cir. 2023), the court held that a front label was ambiguous simply if it was susceptible to multiple



United States District Court
Northern District of California

United States District Court
Northern District of California

meanings. There, the court held that a front label containing the words "Nature Fusion" was ambiguous because it could mean "a number of things: that the products are made with a mixture of natural and synthetic ingredients, that the products are made with a mixture of different natural ingredients, or something else entirely." *Id.* In those circumstances, the reasonable consumer is charged with reading the back label. In *Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 781 (9th Cir. 2024), however, the Ninth Circuit clarified that a front label is not sufficiently ambiguous for purposes of calling the back label into play simply because it is susceptible to two plausible meanings; a front label is sufficiently ambiguous only "when reasonable consumers would *necessarily* require more information before reasonably concluding that the label is making a particular representation." *Id.* at 781. (emphasis added). This would occur, for instance, where the term on the front label is essentially "devoid of [] concrete meaning" such that no reasonable consumer could infer from the label a false message from the label alone. *Id.* At 780.

Here, the top of the product page, with the strike-through price and "traditional retail" text, is sufficiently ambiguous under *Whiteside* to warrant consideration of the "Beyond Compare" table. The phrase "traditional retail" has no obvious discernible meaning; if anything, it begs for an explanation, and thus a reasonable consumer would "necessarily require more information before reasonably concluding" what it means. *Whiteside*, 108 F.4th at 781. The fact that the term does not have an asterisk as in *Whiteside* so as to signal the need to look further is not dispositive here. Even without an asterisk, the term "traditional retail" is essentially devoid of meaning. The Ninth Circuit's decision (though non-binding) in *Bryan v. Del Monte Foods, Inc.*, 2024 WL 4866952, at *1 (9th Cir. Nov. 22, 2024), decided after *Whiteside* is instructive. In *Bryan*, the court applied *Whiteside* to hold that the phrase "fruit naturals" on a fruit cup label was sufficiently ambiguous such that a reasonable consumer would need to look to the back label to understand the representation. This was so even though the phrase was not accompanied by any asterisk or other explicit signal to look elsewhere.

In sum, there is no basis to conclude that a reasonable consumer would assume the Quince pricing scheme implies the product is on sale at a discount from a higher price previously charged for the same item.

United States District Court
Northern District of California

**B. The "Comparable to Competitors" Theory**

Plaintiffs' other theory of deception is that Quince "selectively compares its products *only* to higher-priced luxury brands," CAC ¶ 46, and "engineers a skewed comparison that portrays its products as equivalent to, or better than, those of its competitors." *Id.* ¶ 50. But this theory of deception is viable only if Plaintiffs allege that Quince's products are in fact of inferior quality to the products to which they are compared. It is only in that circumstance that the comparison to prices charged by other retailers would be misleading or unfair. If Quince's products are in fact of comparable quality, the price comparisons are fair. Consumers would be getting a product of comparable quality at a cheaper price – as represented. On the other hand, if Quince's products are inferior to that of the comparators, then using the sales prices of the comparables is misleading – it would be masking an apples-to-oranges comparison.

The FTC offers guidelines addressing this point. The guidelines recognize that, in some cases, a retailer "offer[s] a reduction from the prices being charged . . . by others in the [retailer's] trade area for other merchandise of like grade and quality – in other words, comparable or competing merchandise – to that being advertised." 16 C.F.R. § 233.2(c). Such reference pricing "can serve a useful and legitimate purpose when it is made clear to the consumer that a comparison is being made with other merchandise and the other merchandise is, in fact, of essentially similar quality and obtainable in the area." *Id.*

Plaintiffs do not allege that Quince's products are *not* of "like grade and quality" to the other retailers' products. In fact, they appear to disavow reliance on any claim that the products are not comparable in quality. *See* Opp'n at 6, n.2. ("Plaintiffs' claim is that Quince's Discount Claims are *themselves* fictitious, and that it is those fictions, rather than any supposed claim about quality, that create a false impression of value.")

For the foregoing reasons, Plaintiffs have failed to plausibly allege, under either theory, that Quince's pricing and comparison to "traditional retail" is deceptive.

/

/

## IV. CONCLUSION

Because Plaintiffs have failed to plausibly allege that Defendant's pricing is deceptive, Defendant's Motion to Dismiss is **GRANTED**. Dismissal is with leave to amend. Any amendment must be filed within 30 days.[2]

**IT IS SO ORDERED**.

Dated: October 21, 2026



EDWARD M. CHEN
United States District Judge

---

[2] If Plaintiffs amend and plausibly allege a deception claim, there remain serious questions about whether a nationwide class could proceed wholly under California law. *See Mazza v. American Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012) (holding that a nationwide consumer protection class action could not proceed under California law because California choice of law rules required that each class member's claim be governed by the laws of the jurisdiction in which the transaction took place). California choice of law rules would likely apply. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001). While Plaintiffs have shown that California has "significant contact" with the claims of each class member, *Wash. Mut. Bank v. Superior Ct.*, 24 Cal. 4th 906, 921 (2001), there appear to be "material differences" between California law and the laws of the jurisdictions in which class members reside, *Mazza*, 666 F.3d at 585. For instance, some states require plaintiffs to show that the price they paid was in fact inflated or the item they bought was defective, while others, like California, may allow plaintiffs to recover based on a theory that they would have paid less if they had all the relevant information at the time of purchase. *Compare Robey v. SPARC Grp. LLC*, 256 N.J. 541, 559–60 (2024), *with Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 (9th Cir. 2013). There also appear to be differences in available remedies. Where there are material differences in applicable state laws, California law recognizes that the "place of the wrong has the predominant interest" in applying its laws. *Mazza*, 666 F.3d at 593 (quoting *Hernandez v. Burger*, 102 Cal. App. 3d 795, 802 (1980)). "Under California choice of law rules, the place of the wrong is where the transaction related to the misrepresentation occurred and not where the intention to misrepresent was formed." *Cimoli v. Alacer Corp.*, 587 F. Supp. 3d 978, 989 (N.D. Cal. 2022). This could well mean the law of the state where the consumer viewed the product page and placed the order applies.

However, the Court does not, at this juncture, decide the issue. It simply notes the applicable principles that might apply. Nor does the Court decide whether these questions would be resolved at the pleadings stage or deferred until class certification.